UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHERRY WHITE,

    Plaintiff,

                                              Case No. 11-14893
v.                                            Hon. Lawrence P. Zatkoff

MICHIGAN BELL TELEPHONE
COMPANY,

    Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on December 5, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #23). When Plaintiff did not file a timely response, the Court issued an Order to Show Cause why this case should not be dismissed for failure to prosecute and ordered Plaintiff to file a response by November 2, 2012. Plaintiff did not respond to the Order to Show Cause or file a response to Defendant's Motion for Summary Judgment. The Court finds that the facts and legal arguments are adequately presented in Defendant's papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that Defendant's Motion be resolved on the briefs submitted. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

In this employment discrimination case, Plaintiff, an African American female, alleges that Defendant discriminated and retaliated against her because of her race. Plaintiff started working for Defendant on September 25, 2000. During her employment, Plaintiff was a member of the Communications Workers of America (the "Union"), and the terms and conditions of her employment were governed by applicable Collective Bargaining Agreement ("CBA"). Plaintiff started as a customer service representative and experienced "some conflict" with her then-supervisor, Gwendolyn Baldwin, an African American female, during her training sessions. Plaintiff claimed Baldwin "approached her in an inappropriate manner." Thereafter, Plaintiff complained to her Union and was removed from Baldwin's supervision.

In 2008, Plaintiff became a dispatcher in Defendant's U-verse Department ("UVDC"). The UVDC is comprised of the following departments: (1) Load and Control Department; (2) Jeopardy Department; (3) Centralized Scheduling Group; and (4) Call Center. Plaintiff started as a dispatcher in the UVDC's Call Center, for which she received "several weeks" of dispatcher training. Plaintiff successfully completed that training on October 30, 2008.

In January 2009, Plaintiff transferred within the UVDC to the Load and Control Department ("Control Department"), where she continued to work as a dispatcher, under the initial supervision of Aaron Klawuhn. Plaintiff's Control Department duties consisted of "[c]ontacting various garages, technicians, calling customers to make sure they [were] going to be home, receiving inbound calls on customers, checking [the] status if their service [wasn't] up and running." Although Plaintiff subjectively believes that her performance in 2009 was satisfactory, it is undisputed that Plaintiff received an overall rating of "below expectations" on her 2009 performance

evaluation. In fact, during 2009, Plaintiff received the following corrective actions, each of which involved the Union filing a grievance on her behalf, such that the severity of each corrective action was reduced:

· April 4, 2009: Verbal warning for tardiness;

· July 29, 2009: Written warning for attendance; and

· December 8, 2009: Written warning for tardiness.

As her deposition testimony reflects, Plaintiff was aware of her poor job performance:

> Before 2010, I think I had some write-ups here and there for something, talking too long, on the calls too long, things of that nature. Lengthy calls was (sic) one of my weak areas.

Plaintiff's substandard performance became even more apparent once the UDVC began tracking its dispatchers' productivity using a computerized database known as the Business Enterprise Reporting Tool ("BERT"). BERT is a self-reporting timekeeping system that tracks a dispatcher's daily work activity. All dispatchers in the UVDC are required to input their tasks into BERT once they are completed. Each time a dispatcher completes a task, he or she is required to click a box in BERT. Through BERT, Defendant is able to track how long it takes a dispatcher to perform one task and how long it takes a dispatcher to move from one task to another. According to Plaintiff, she began using BERT in January 2009.[1] Plaintiff admits that she received "a couple of months of training" on BERT and that the training occurred in a classroom. Plaintiff further acknowledges that she received two months of "pilot" training before she was held accountable for

---

[1]Defendant contends that Plaintiff has her years mixed up. Specifically, Defendant contends that Plaintiff was trained for two months in 2009 and that BERT went into effect on January 2010. For purposes of this motion–because the Court must view all "facts" in a light most favorable to Plaintiff, the Court shall assume that Plaintiff's testimony is accurate.

her BERT entries. Plaintiff was coached by her managers during this time period. Specifically, in November 2009, Aaron Klawuhn, Plaintiff's then-supervisor, informed Plaintiff that "she still need[ed] to show more progress in her BERT scores." By December 2009, Plaintiff had improved her time entries and was able to meet "her minimum objectives in BERT." On January 1, 2010, all UVDC dispatchers who had received BERT training were subject to disciplinary action if they failed to input time into BERT or failed to meet Defendant's expected BERT efficiency. Both African American and Caucasian dispatchers in the Control Department, including Plaintiff, received disciplinary actions when they failed to properly use BERT.

On January 26, 2010, Plaintiff received a verbal warning for failing to account for: (a) 3.25 hours on January 22, 2010, and (b) 2.23 hours on January 23, 2010. On February 11, 2010, Plaintiff received another corrective action for again failing to account for over two hours in BERT. Plaintiff admits that she has no explanation as to why she had so many unaccounted hours. On February 13, 2010, two days after receiving a written warning, Plaintiff went on disability leave. Plaintiff acknowledges that she was not subjected to any discriminatory conduct prior to her disability leave. While Plaintiff was on disability leave, Defendant lowered its BERT Efficiency expectations from 90% to 87%. During this time, the UVDC also updated its system with a program called Force. Employees were provided a two-day training session on how to use Force. Plaintiff was scheduled to attend the training, but she was out on disability leave when the training was provided.

On June 22, 2010, Plaintiff returned from disability leave, but she was on a four-hour workday restriction. Because Plaintiff had missed the two-day session on Force, Plaintiff trained with other experienced dispatchers on how to use the program. Specifically, on June 23, 2010, Shiffon Scurry-Meeks, an African American dispatcher, sat with Plaintiff and provided one-on one training

4

on how to use Force. Plaintiff's Force training continued on June 25, 2010 and June 26, 2010 with Ashley Jackson, another African American dispatcher.

On June 25, 2010, Defendant sought volunteer dispatchers from the Control Department to temporarily work in the Jeopardy Department for a few months. Plaintiff volunteered for the temporary assignment and was transferred to the Jeopardy Department, along with two other dispatchers, Ruby Carlton and Geralynn Miller. Although Plaintiff was being temporarily loaned to the Jeopardy Department, she remained a part of the Control Department. While in the Jeopardy Department, Plaintiff continued to receive Force training. Plaintiff trained with a dispatcher named Trivola Plump, who Plaintiff found to be "very helpful." In addition, Plaintiff's primary supervisor in the Jeopardy Department, Dave Johnson, assigned Naticka Orange ("Ms. Orange"), an African American dispatcher and then-Union steward, to provide Plaintiff with extensive one-on-one training on how to use Force and perform basic tasks in the Jeopardy Department. Dave Johnson chose Ms. Orange to be Plaintiff's primary trainer because Ms. Orange was a high-performer and had extensive experience using Force, Edge, and BERT. Ms. Orange was instructed to train Plaintiff so that she could perform basic dispatcher tasks using the Force and Edge program. Accordingly, Ms. Orange provided one-on-one training with Plaintiff on the following days:

- June 29, 2010;
- June 30, 2010;
- July 1, 2010;
- July 2, 2010;
- July 7, 2010;
- July 8, 2010;
- July 9, 2010; and
- July 10, 2010.

During this time, Plaintiff admits that she never voiced any concerns about her training to Ms. Orange, or any other dispatcher that had trained her, "while they were training [her]."

5

On July 16, 2010, Plaintiff's work restrictions were lifted and she resumed working full eight-hour days. Plaintiff knew that she would be expected to use BERT once her work restrictions were lifted:

> Q. Okay. After you transferred to [the Jeopardy Department] in June of 2010 who first notified you that your performance had to improve?
>
> A. Who first notified me? First of all, let's see, June ---
>
> Q. Well, let's do this –
>
> A. Kevin McDonald. That was the manager at that time.
>
> Q. And do you recall what he told you?
>
> A. That I'd be expected to start BERTing, I was working at the time four hours a day on a gradual return, that when those restrictions were lifted that I would be expected to do the BERTing.

Notwithstanding the above notice, on July 16, 2010, Plaintiff failed to account for five hours of her workday, not including her scheduled breaks and lunch. In addition, Plaintiff's BERT report showed that Plaintiff did not start her first task until 25 minutes after her shift started and stopped working 16 minutes before her shift ended. As a result, Plaintiff received a one-day suspension for overall job performance. In an effort to help Plaintiff with her BERT entries, Plaintiff received a task sheet on how to BERT so that she understood Defendant's expectations.

The very next day, on July 17, 2010, Plaintiff made an internal complaint, claiming she was being harassed and discriminated against because of her race. The internal complaint was promptly investigated by Constance Johnson ("Ms. Johnson"), Defendant's Senior Equal Employment Opportunity Consultant. During Ms. Johnson's investigation, Plaintiff claimed that she did not receive proper training. Ms. Johnson's investigation revealed that: (a) Plaintiff had received significant one-on-one training, and (b) both Caucasian and African American dispatchers were

receiving corrective actions for the same type of conduct.

On July 23, 2010, Terry Hewer, Defendant's Area Manager of the Jeopardy Department, held a meeting to remind Jeopardy dispatchers that all BERT entries must be accurate and timely in order to comply with Defendant's expectations. During the meeting, Plaintiff: (a) stated that she had been recently disciplined for failing to use BERT, and (b) for the first time, claimed that she unhappy with her training with Ms. Orange. Although Plaintiff asserts her training with Ms. Orange was inadequate, Plaintiff admits that she was able to "practice" her tasks with Ms. Orange and that Ms. Orange provided job aids to help her perform her duties. Plaintiff further concedes that Ms. Orange continued to help Plaintiff after their training had completed. Terry Hewer informed Plaintiff that she could return to the Control Department, if she desired. Plaintiff declined that offer.

On July 29, 2010, the Union, on Plaintiff's behalf, became involved in the situation. The Union met with Defendant's Area Manager of the Control Department, Bruce Downey, to discuss Plaintiff's training. The Union informed Bruce Downey that Plaintiff wanted more training on a program called Edge and on how to read helper tickets. In response, Dave Johnson, Plaintiff's primary supervisor in the Jeopardy Department, sat with Plaintiff to train and observe her on both issues. Based on Dave Johnson's observation, Plaintiff understood how to perform her tasks. On August 4, 2010, Plaintiff filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR").

On August 11, 2010, Plaintiff was placed on an Individual Action Plan because her BERT efficiency for the month of July was 55.8%, well below Defendant's expectations of 87%, which Plaintiff admits she understood. To help improve her BERT scores, Kevin McDonald, Plaintiff's direct supervisor in the Control Department, sat with Plaintiff to ensure that she understood how to

use BERT. On August 14, 2010, Plaintiff received additional BERT training with Ed Milton, an African American employee, who had recently been promoted from dispatcher to manager. Plaintiff claims that the training was "horrible" because Ed Milton yelled at her and stated, "I see why you keep getting written up." Nonetheless, Ed Milton believed Plaintiff was fully capable of inputting her time into BERT. On August 31, 2010, Dave Johnson sat with Plaintiff again and provided additional training on helper tickets.

On September 9, 2010, Plaintiff received a three-day suspension for failing to account for hours of missing time from August 4, 2010 through August 24, 2010. Through the grievance procedure, the Union was able to reduce the suspension to a written warning, provided that Plaintiff did not have any other performance issues for nine months. On October 6, 2010, Plaintiff's three-day suspension was reinstated because Plaintiff had 3.16 hours of nonproductive time in BERT, and took 1.25 hours of exception time without proper approval, on September 28, 2010.

On or around October 16, 2010, Plaintiff's temporary loan to the Jeopardy Department ended and she returned to the Control Department. Upon her return, Plaintiff continued to receive training on basic dispatcher tasks from Jeff Perez, a manager in the Control Department, and Amber Davenport, a dispatcher. On October 19, 2010, Robyn Goines, an African American dispatcher, also sat with Plaintiff and guided her through basic tasks. Plaintiff was also given job aids to assist her in carrying out her tasks. Tashema Adams, an African American dispatcher, also provided one-on-one training with Plaintiff and created a job aid to help Plaintiff input her tasks into BERT. Plaintiff admits that she was satisfied with the training from both dispatchers:

> Q. But you concede that some of the people that sat with you and trained you did a good job of it, correct? You said Robyn Goines was good?
>
> A. She was good at what she done, yeah.

8

> Q. Tashema Adams was good?
>
> A. She was. She was one of the people that had extensive training so she was excellent at what she done. And more experienced.

On October 18, 2010, Plaintiff filed another internal complaint. Plaintiff again asserted that she was not receiving proper training. Ms. Johnson, who was already investigating Plaintiff's MDCR complaint, investigated the internal complaint. Shortly thereafter, in November 2010, the Control Department restructured its management. Under the new management structure, Marcia Gilin-Thomas became Plaintiff's direct supervisor. On February 3, 2011, Plaintiff was suspended pending termination after it was discovered that Plaintiff: (a) had failed to account for 53:19 minutes in BERT, and (b) spent over 87 minutes in a customer status code that she was not tasked to handle. Bruce Downey, Defendant's Area Manager of the Control Department, testified that: (1) Plaintiff was not adequately performing her job duties, (2) he made the decision to terminate Plaintiff based on the good faith belief that Plaintiff failed to adequately perform her job, and (3) his decision was not related whatsoever to Plaintiff's race.

Under the CBA, the Union had the right to request a Review Board Hearing and present evidence contesting any termination decision, but the Union ultimately decided not to continue to pursue a grievance on Plaintiff's behalf. Instead, the Union informed Plaintiff that it was likely that an arbitrator would conclude that Defendant had just cause to terminate her employment since management has the right to develop minimum performance standards. Accordingly, Plaintiff's termination took effect on February 3, 2011.

On February 17, 2011, Plaintiff filed another complaint with the MDCR, contending that she had been discriminated and retaliated against due to her race. The MDCR, however, dismissed the complaint with no finding of discrimination. The Equal Employment Opportunity Commission

9

("EEOC") adopted the MDCR's finding. On November 7, 2011, Plaintiff filed a two-count Complaint in this Court, wherein she alleged that Defendant violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e et seq., when Defendant: (a) harassed and discriminated against her based on her race (Count I); and (b) retaliated against her for filing a complaint with the MDCR (Count II).

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.

*Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. Race Discrimination

In this case, Plaintiff has no direct evidence of discrimination and, therefore, must rely upon circumstantial evidence. In relying upon circumstantial evidence, Plaintiff must establish a *prima facie* claim of disparate treatment discrimination by showing that:

> (1) she was a member of a protected group;
>
> (2) she was qualified for the job; and
>
> (3) she was treated differently than similarly situated employees who were outside the protected group for the same or similar conduct.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973). If Plaintiff can establish a *prima facie* case of discrimination, the burden of persuasion shifts to the employer to articulate a legitimate, non-discriminatory reason for its treatment of plaintiff. *Id*. Once Defendant has articulated a legitimate,

11

non-discriminatory reason, Plaintiff's claim fails unless Plaintiff can establish pretext by showing both that Defendant's stated reason is false and that discrimination was the true reason for its actions. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133 (2000).

   *1.    No Similarly Situated Employees*

Plaintiff alleges that after she transferred to the Jeopardy Department she was subjected to discrimination. Specifically, Plaintiff claims that, shortly after she was temporarily loaned to the Jeopardy Department, a group of surplus employees, whose prior positions had been "phased out," came into the Jeopardy Department to "learn[] a new job." This group of surplus employees received classroom training and extended time to learn the UVDC system, including Edge, Force, and BERT. Although Plaintiff subjectively believes that she should have been included in this classroom training, the training was actually a two-week introductory course for employees who, unlike Plaintiff, had no prior dispatcher experience. The majority of the employees who received the classroom training were prior field technicians. More significantly, none of the employees who received the classroom training had been a dispatcher previously. Plaintiff, on the other hand, had been a dispatcher in the UVDC since 2008, and she had received "several weeks" of and introductory dispatcher training course when she first became a dispatcher:

> Q.   And what did this training entail?
>
> A.   Basically being introduced to the area, having knowledge of the new area, and their verbiage and how to use different systems, et cetera.
>
> Q.   How long was the training?
>
> A.   I don't remember. I want to say it was several weeks.
>
> \*\*\*
>
> Q.   Was this training required for dispatchers?

12

> A. Yes, it was required.

Moreover, Plaintiff testified that she: (1) had been using the BERT program since as earlier as January 2009, and (2) understood how to meet Defendant's expectations no later than December 2009. Accordingly, the Court finds there is no genuine dispute of material fact that Plaintiff was not similarly situated to the "surplus employees" with whom she compares herself.

The Court also notes that Plaintiff acknowledges that both Caucasian employees and African American employees received this training:

> Q. So there were black and white employees in [the Jeopardy Department] that you are contending received better and more training than you?
>
> A. They got extensions, long months and months and months which –
>
> Q. But in terms of race they are both white and African American?
>
> A. Yes.

In addition, even if Plaintiff could somehow establish a *prima facie* case, the Court finds that Defendant has articulated a legitimate non-discriminatory reason for not providing Plaintiff with the same classroom training as the surplus employees and new hires. The two-week training was merely an introductory course to introduce the employees to the UVDC and to give them an overview on the duties of a dispatcher. During the introductory course, employees completed their in-processing, learned the department's policies and procedures, and were given an overview on UVDC programs, such as Force, Edge, and BERT. After the two-week introductory course was completed, each dispatcher received a two-month training period before being held accountable in BERT, just as Plaintiff had when she was training in BERT. Plaintiff was not a part of the introductory course because she had been a dispatcher since 2008 and was already familiar with the UVDC, as she had already been provided the several week introductory training course and had received the two-month

training period.

Finally, since Defendant has met its burden by articulating a legitimate, non-discriminatory reason for not providing classroom training to Plaintiff, Plaintiff would have to show that Defendant's reason was pretextual to survive summary judgment. *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 526 (6th Cir. 2008). Plaintiff cannot make this showing. Most notably, Plaintiff concedes that other African American employees received the training she claims she did not.

*2. Plaintiff Was Terminated for Legitimate, Non-Discriminatory Reasons*

Defendant has proffered a legitimate, non-discriminatory business reason for terminating Plaintiff's employment – failing to meet her job expectations. *Stockman v. Oakcrest Dental Center, P.C.*, 480 F.3d 791, 802 (6th Cir. 2007) ("Poor performance is a legitimate nondiscriminatory reason for terminating an employee"). Despite repeated warnings, meetings with the Union representatives, and on-the-job training, Plaintiff continuously failed to properly track her productivity in BERT. Plaintiff has not offered any evidence otherwise, and Plaintiff, herself, is unable to explain why she had such large gaps on certain days, but not others. Likewise, Plaintiff offers no evidence to establish that Defendant's reasons for terminating her were pretextual.

The Court also finds that Defendant had a good faith belief that Plaintiff did not adequately perform her job duties. Under the honest belief rule, "when an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). Thus, the mere fact that Plaintiff may disagree with Defendant's business decision is insufficient. *See Stockman*, 480 F.3d at 802 ("An employee's opinion that [s]he did not perform poorly is irrelevant to establishing pretext where the employer

14

reasonably relied on specific facts before it indicating that the employee's performance was poor"). *See also Hendrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (the role of the Court is "not to act as a 'super personnel department' that second guesses employers' business judgments.").

    *3.    Conclusion*

Accordingly, for the reasons set forth above, the Court concludes that Plaintiff's claims of race discrimination fail, as a matter of law.

**B.    Racial Harassment**

A plaintiff establishes a *prima facie* case of racial harassment by showing that:

    (1)    the plaintiff was a member of a protected class;

    (2)    the plaintiff was subjected to unwelcome racial harassment;

    (3)    the harassment was race-based;

    (4)    the harassment unreasonably interfered with the plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and

    (5)    the employer knew or should have known about the harassing conduct but failed to take corrective action.

*Lindsey v. Whirlpool Corp.,* 295 Fed.Appx. 758, 765 (6th Cir. 2008) (citing *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir.2008)).

In this case, Plaintiff merely asserts that after she transferred to the Jeopardy Department, she was "disrespected on a regular [basis]," "belittled," and followed around by managers. Notably absent from Plaintiff's allegation is any race-based conduct or comment. *See, e.g. Spraggins v. Lakepointe Senior Care*, No. 08–14074, 2010 WL 3927769 (E.D. Mich. Oct. 4, 2012) (calling plaintiffs "stupid, incompetent and liars, . . . [were] not race-based and do not demonstrate any racial

animus on their face").

In addition, the Court concludes that the described harassment alleged by Plaintiff is not severe or pervasive enough to constitute a hostile work environment based on race. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993). The alleged harassment of feeling disrespected or belittled is insufficient to meet this standard. It is well established that "Title VII is not 'a general civility code for the American workplace.'" *Burnett v. Tyco Corp.,* 203 F.3d 980, 982 (6th Cir. 2000). Plaintiff's allegations of harassment establish, at best, a personality conflict with management; however, such allegations are not enough. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000) ("Personal conflict does not equate with discriminatory animus").

Accordingly, as Plaintiff's allegations and proofs are devoid of any evidence that the alleged harassment was race-based, Plaintiff's claim of racial harassment fails as a matter of law.

**C.     Plaintiff's Retaliation Claim**

Plaintiff asserts that Defendant retaliated against her by terminating her employment after she filed complaints of race discrimination. To establish a *prima face* claim for retaliation, Plaintiff must show that:

>  (1)     she engaged in activity protected by Title VII;
> 
>  (2)     this exercise of protected rights was known to the defendant;
> 
>  (3)     the defendant thereafter took adverse employment action against the plaintiff; and
> 
>  (4)     there was a causal connection between the protected activity and the adverse

employment action or harassment.

*Id.* at 792.

The Court finds that Plaintiff has offered no evidence of a causal connection between the protected activity and the termination of her employment. Plaintiff's only possible support for a causal connection appears to be the fact that one event occurred before the other. This unsupported conclusion falls far short of proving that a connection exists between Plaintiff's complaints of discrimination and her termination, which occurred approximately four months later. It is well established that temporal proximity alone between protected activity and an adverse employment action is not enough to satisfy the causation element of plaintiff's *prima facie* case. *See, e.g., Latosky v. Morrison-Knudsen Corp.*, 1996 WL 708346, *3 (6th Cir. 1996) ("[T]he mere fact that adverse employment actions occurred after plaintiff engaged in protected activity is insufficient to support an inference of retaliation."). *See also Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 718 (6th Cir. 2007). As such, the Court finds that Plaintiff cannot prove the fourth element of a retaliation claim, and her retaliation claim must be dismissed.

As with her race discrimination and harassment claim, even if Plaintiff could establish a *prima facie* claim, Defendant has articulated a legitimate non-retaliatory reason for terminating Plaintiff's employment. Defendant represents that it terminated Plaintiff based on its good faith belief that her job performance failed to meet Defendant's expectations. Because Plaintiff cannot show that this reason was pretext for retaliation, the Court concludes that her retaliation claim must be dismissed.

## V. CONCLUSION

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Defendant's Motion

for Summary Judgment (Docket #23) is GRANTED.

    IT IS SO ORDERED.

                                                                                  S/Lawrence P. Zatkoff  
                                                                                  LAWRENCE P. ZATKOFF  
                                                                                  UNITED STATES DISTRICT JUDGE